UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:08-CV-00046-TBR

PAMELA S. RUDOLPH                                                                          PLAINTIFF

v.

UNITED STATES ENRICHMENT
CORPORATION, INC.                                                                          DEFENDANT

MEMORANDUM OPINION

This matter comes before the Court on Defendant's Motion for Summary Judgment (DN 17). Plaintiff responded (DN 18), and Defendant replied (DN 19). This matter is now ripe for adjudication. For the reasons that follow, Defendant's Motion is GRANTED.

BACKGROUND

Plaintiff Pamela S. Rudolph brought this employment discrimination action, alleging that her former employer, Defendant United States Enrichment Corporation, Inc. ("USEC"), discriminated against her on the basis of its perception that she was disabled, on the basis of her sex, and on the basis of her age. Rudolph's claims arise pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Kentucky Civil Rights Act, Ky. Rev. Stat. § 344.010 *et seq.*

On February 19, 2007, USEC hired Rudolph as an operator trainee. Operator trainees undergo a 360-day training. The 360-day training is broken into four 90-day training modules. Near the end of each 90-day module, the trainees are evaluated by an operations trainer or an operations front line manager. Trainees must successfully complete one training module before

proceeding to the next training module.

Rudolph was one of twelve operator trainees. Four of the operator trainees, including Rudolph, were female. Three, including Rudolph, were over forty years old. From this original group, one 26 year old male was discharged for discipline purposes and one 29 year old male resigned rather than face discipline charges. Of the remaining operator trainees, only Rudolph did not progress to the second 90-day training module.

The first part of the operator training is an intensive classroom session taught by plant personnel. The trainees spend several days with classroom work and fill in answers to questions contained in their operator trainee handbook. Approximately halfway through the first 90-day module, trainees are assigned to operator work crews within the plant. Rudolph was assigned to a work crew managed by front line manager Ron Dockery.

The purpose of assigning trainees to operator work crews is to allow trainees to accompany plant operators when they perform their jobs and to learn through on-the-job training ("OJT"). The training handbook that every trainee receives explains the trainee's responsibility during the OJT training:

> It is the trainee's responsibility to seek out the information needed to successfully complete the subject matter. This can be done by reading the appropriate operating procedures and regulatory documents, observation and actual performance of the job under guidance, and instruction by operators and managers. . . . During the [OJT] phase, the trainee is responsible for observing, practicing and performing the tasks under the observation/instruction of a qualified cascade operator, technical trainer, or manager.

Def's Ex. A. Trainees were required to pass six hands-on tests as part of their trainee requirements for the first 90-day module. According to the affidavit of Craig Willett, who was the acting manager of the process building where Rudolph worked, on July 7, 2007, Rudolph

failed the "pull assay samples" test and the "obtain a $UF_6$ Safety Sample test." She passed the remaining tests on July 7, July 11, and July 17, 2007.

USEC's trainee evaluation policy allows trainees who fail an evaluation to retake the test. The policy states that the instructor shall "ensure remedial plan, including reexamination, is completed with **15** scheduled working days of date of failure." The training handbook also states that if a trainee fails an OJT evaluation, the evaluator "will discuss weaknesses identified and assign appropriate remediation steps." Rudolph was never given an opportunity for remediation regarding the two test modules she failed. The only other operator who failed a test was Phyllis Pharis-Baete, a 60 year old female. She failed the "obtain a $UF_6$ Safety Sample test" on July 18, was remediated and passed the next day. She had passed all of her other tests by July 17, 2007.

In addition to completing the six tests and completing all written questions in the training handbook, each operator trainee was required to undergo an oral evaluation from a member of upper management. Willett conducted the evaluation for some trainees. He had a policy of having each trainee come to him a few days before the evaluation in order the give the trainee a dry run regarding what questions would be asked or what tasks would be required. On or about July 16, 2007, Willett conducted his dry run review with Rudolph. Rudolph's front line manager, Dockery, and Jeff Burkhalter, who was to become the manager of the process building where Rudolph worked, also attended the dry run review.

According to Willett's deposition, Rudolph did not know the answers to many questions he presented to her during the oral evaluation. In addition, she was not able to identify several pump components of the seal exhaust pump when they went out into the plant. Willett believed that it was unlikely that Rudolph could satisfactorily perform her final 90-day oral and practical

evaluation, and told his supervisor that Rudolph's evaluation did not go well relative to other trainees.  He stated that she was "not progressing" or "retaining information that she has previously been trained on."

On July 18, 2007, USEC discharged Rudolph.  Rudolph claims that this termination was based on USEC's perception that she was disabled.  Rudolph's disability discrimination claim is based on Dockery's concern about her physical abilities.  Dockery kept a supervisory performance log on Rudolph that chronicles his observations regarding her ability to perform tasks.  *See* Def's Ex. D.  On May 16, Dockery observed that Rudolph had difficulty going up the stairs.[1]  He said that she had to hold onto the rail and could only go one step at a time.  Rudolph told Dockery that she had knee surgery in the past.  Rudolph states that she also told Dockery that climbing stairs was getting easier with repetition.

Even though Rudolph had passed her initial medical screening by plant personnel, she was asked to return to the Medical Department for another evaluation with respect to her knees.  Rudolph was released by the medical staff with no restrictions, with the report that her knees only had normal "wear and tear."  She performed all physical tasks assigned to her, and did not receive any special treatment.  Dockery's log also states that she never complained or refused to perform a task.

Rudolph states that even after she was released by USEC's medical staff a second time, Dockery continued to focus on her physical abilities in his performance log.  Some of the entries in Dockery's log are based on reports made by third parties regarding Rudolph's conduct, and

---

[1] The May 16, 2007 entry was written by Anthony Gilbert and refers to a conversation with Dockery.  Dockery confirmed the accuracy of the entry in his deposition.

several are based on Dockery's direct observations. Dockery reported that he was told that Rudolph walked very slowly and that a third party was concerned Rudolph was not physically able to perform all tasks required of an operator. Dockery directly observed and recorded that Rudolph became overheated on two occasions and also had difficulty with her back when opening and closing valves. On July 10, Dockery recorded that he "discussed his concerns about Rudolph's physical ability to perform the jobs of an operator" with Willett. In his deposition, Dockery explained that this entry referred to his concern about Rudolph's trouble opening valves. Dockery Dep. 118:14, Aug. 13, 2008.

Rudolph also claims that USEC discriminated against her because she was an older female trainee. She makes a variety of allegations to support this claim. Primarily, Rudolph states that the male employees on her crew resisted training her, and this refusal was based on their bias against older female trainees. These employees also allegedly excluded her from conversations and made derogatory comments about older women.

USEC states that it terminated Rudolph because she "failed two out of six procedures which were required by all trainees to pass within 90 days of the training period," because Management believed she "did not understand the basic plant processes which were a part of the operator's job duties," and she "failed to retain information which she had been taught." USEC states that Senior Management came to this determination after Rudolph's dry run review with Willett, and after receiving input from Dockery and Willett.

## STANDARD

Defendant USEC argues that it is entitled to judgment as a matter of law. Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and

5

any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

*A.       Rudolph's Claim of Discrimination Based on a Perceived Disability*

   *1.       Retroactive Effect of the ADA Amendments Act of 2008*

The ADA provides that an employer shall not "discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . advancement, or discharge of employees, . . . job training, and other terms, conditions, and privileges of

employment." 42 U.S.C. § 12112(a). The ADA was amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008), which took effect on January 1, 2009. Among other things, the ADA Amendments Act rewrote 42 U.S.C. § 12102, which formerly read:

> (2) Disability
> The term "disability" means, with respect to an individual--
> > (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> > (B) a record of such an impairment; or
> > (C) being regarded as having such an impairment.

That section now reads:

> (1) Disability
> The term "disability" means, with respect to an individual--
> > (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
> > (B) a record of such an impairment; or
> > (C) being regarded as having such an impairment (as described in paragraph (3)).

Paragraph (3) provides:

> (3) Regarded as having such an impairment
> For purposes of paragraph (1)(C):
> > (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.
> > (B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

Rudolph states that the amended Act should be applied in this matter. She does not cite any authority to support this contention.

A primary purpose of the ADA Amendments Act was to reinstate "a broad scope of protection to be available under the ADA." Pub. L. No. 110-325, § 122 Stat. 3553, 3554 (2008). Congress specifically found that the Supreme Court "narrowed the broad scope of protection intended to be afforded by the ADA" in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), and *Toyota Motor Manufacturing v. Williams*, 534 U.S. 184 (2002). *Id.*; *see also Verhoff v. Time Warner Cable, Inc.*, Nos. 07-4265, 07-4348, 2008 WL 4691794, at *4 (6th Cir. Oct. 24, 2008) (discussing ADA Amendments Act). Under the prior version of the ADA, an individual had a "disability" if she was "regarded as having" "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2), *amended by* Pub. L. No. 110-325. Now, this definition has been expanded so that an individual has a "disability" if she has been subjected to a prohibited action "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity," unless the impairment is transitory and minor. 42 U.S.C. § 12102(3)(A); *see also* United States Equal Employment Opportunity Commission, Notice Concerning The Americans With Disabilities Act (ADA) Amendments Act of 2008, Oct. 6, 2008, http://www.eeoc.gov/ada/amendments_notice.html.

Because the ADA Amendments Act took effect on January 1, 2009, the Court must determine whether the version of the ADA that was in effect when the alleged discrimination occurred applies in this matter, or whether the amended ADA applies retroactively. "As a general rule, a court must 'apply the law in effect at the time it renders its decision.'" *BellSouth Telecomms., Inc. v. Se. Tel., Inc.*, 462 F.3d 650, 657 (6th Cir. 2006) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 263-64 (1994)). This general rule applies "*unless* that law would

have an impermissible retroactive effect as that concept is defined by the Supreme Court." *Id.*

The first step in the Supreme Court's retroactivity analysis "is to determine whether Congress has expressly prescribed the statute's proper reach." *Landgraf*, 511 U.S. at 280. If "the statute contains no such express command, the court must determine whether the new statute would have retroactive effect." *Id.* That is, whether the new statute "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* If the new statute would have retroactive effect, then "it does not govern absent clear congressional intent favoring" retroactive application. *Id.* The "requirement that Congress first make its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness." *Id.* at 268. Congress' clear intent to overturn a judicial decision and "restore" the protection originally intended by Congress to be available under a statute "does not, by itself, reveal whether Congress intends the 'overruling' statute to apply retroactively to events that would otherwise be governed by the judicial decision." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 304-05 (1994).

Here, the ADA Amendments Act only provides that "[t]his Act and the amendments made by this Act shall become effective on January 1, 2009." Pub. L. No. 110-325, § 122 Stat. 3553, 3559 (2008). The Court has also reviewed the legislative history of the ADA Amendments Act and could find no statement in the congressional record relating to the retroactive effect of the Act or the Act's application to pending cases. Thus, the Court finds that there is no clear congressional intent favoring retroactive application. Additionally, the Court finds that because the ADA Amendments Act broadens the definition of "disability" and who

may have a cause of action under the "regarded as" prong of the Act, the amended Act would potentially increase USEC's liability for past conduct. Therefore, the amended Act does not govern this matter.

    *2.    Rudolph's Prima Facie Case of Disability Discrimination*

"Under the ADA, in the absence of direct evidence of disability discrimination, a plaintiff may seek to establish a prima facie case of discrimination." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999). To establish a prima facie case of discrimination under the ADA, a plaintiff "must show that he is (1) a disabled person within the meaning of the Act, (2) that he is otherwise qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) that he suffered an adverse employment decision due to his disability." *Id.* "Once established, a prima facie case shifts the burden to the employer to offer a legitimate, nondiscriminatory reason for its action. If the employer articulates such a reason, the plaintiff must then show that the reason given by the employer is pretextual in order to prevail." *Id.*

The pre-January 1, 2009 version of the ADA (hereinafter "ADA"), defined "a disabled person as one who (1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (2) has a record of such impairment, or (3) does not have an impairment, but is regarded as having one." *Id.* (citing 42 U.S.C. § 12102(2)). Rudolph claims that she was "regarded as" disabled by USEC. "[A]n individual may fall into the definition of one regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties." *Ross v. Campbell Soup Co.*, 237 F.3d 701,

706 (6th Cir. 2001); *see also Sutton*, 527 U.S. at 489 (describing how an individual may fall within the statutory definition of being regarded as disabled). Rudolph asserts that USEC regarded her as disabled because it believed her knee troubles substantially limited her ability to walk and to climb stairs.

When an individual seeks to proceed under a "regarded as" theory, the Court must look to the motive of the employer to determine whether the individual is disabled within the meaning of the ADA. *Ross*, 237 F.3d at 706. The employer "must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton*, 527 U.S. at 489. To present evidence on which the trier of fact could reasonably find for the individual, therefore, the individual must show that her employer believed she had a medical impairment, and that the employer believed that this impairment substantially limited one or more major life activities.

Here, Rudolph has presented some evidence that Dockery believed she had trouble walking and climbing stairs. Dockery observed in his performance log of Rudolph that she had difficulty going up the stairs. She was then asked to return to the medical department for another evaluation with respect to her knees. After the medical department cleared her, Dockery included in the log a report from another employee that Rudolph had trouble walking.

This evidence, however, does not show that Dockery believed Rudolph was substantially limited in her ability to walk or to climb stairs. Under the applicable Supreme Court precedent, "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota Motor Mfg.*, 534 U.S. at 198 (citing walking as

11

an example of an activity of central importance). Though there is evidence that Dockery was initially concerned about Rudolph's ability to climb stairs, that is not sufficient to show that he believed that her knee prevented or severely restricted her ability to walk or to climb stairs. Rudolph had no medical restrictions and was assigned all tasks routinely performed by operator trainees. After she was cleared by the medical department, Dockery did not note in the performance log any personal observation of Rudolph having difficulties with walking or with climbing stairs. Also, Rudolph does not present any evidence that Dockery provided her with any special treatment relating to her physical abilities.

Because Rudolph has not presented evidence that USEC believed that she had a substantially limiting impairment, she fails to satisfy the first part of her prima facie case by not showing that she is a disabled person within the meaning of the ADA. Therefore, USEC is entitled to summary judgment on Rudolph's claim of discrimination based on a perceived disability pursuant to the ADA and the Kentucky Civil Rights Act.[2]

B.      *Rudolph's Claim of Sex Discrimination*

    1.      *Single-Motive and Mixed-Motive Title VII Discrimination Claims*

The Sixth Circuit recently discussed the distinction between "single-motive" and "mixed-motive" discrimination claims brought pursuant to Title VII, 42 U.S.C. § 2000e-2(a)(1). *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008). Single-motive claims are "where an illegitimate reason motivated an employment decision," whereas mixed-motive claims are "where both legitimate and illegitimate reasons motivated the employer's decision." *Id.* "[A]

---

[2] The Sixth Circuit has interpreted the Kentucky Civil Rights Act consistent with the ADA. *Henderson v. Ardco, Inc.*, 247 F.3d 645, 649 (6th Cir. 2001).

Title VII plaintiff seeking to prove a claim of single-motive discrimination by means of circumstantial evidence must survive a series of shifting burdens of production:"

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Id.* at 398 n.9 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981)). "In order to survive a defendant's motion for summary judgment, the single-motive Title VII plaintiff must produce sufficient evidence to overcome these burdens of production." *Id.* This burden-shifting framework, however, "does not apply to the summary judgment analysis of Title VII mixed-motive claims." *Id.* at 400. Instead, the Sixth Circuit held:

> [T]o survive a defendant's motion for summary judgment, a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was a motivating factor' for the defendant's adverse employment action.

*Id.* (quoting 42 U.S.C. § 2000e-2(m)).

USEC's Motion for Summary Judgment treats Rudolph's claim as mixed-motive. Rudolph, in response, does not directly address whether her claim is single-motive or mixed-motive, but states that the burden-shifting framework applies. In its reply, USEC only rebuts Rudolph's arguments, and does not address which analysis should apply to Rudolph's sex discrimination claim.

Rudolph never discusses, in either her Complaint or in her Response, whether she

intended to state a single-motive or mixed-motive discrimination claim. The Complaint states that "Plaintiff's sex was a motivating factor in Defendant's treatment of her," but does not state that another, legitimate factor could also have motivated USEC's decision. Her Response does, however, impliedly acknowledge that her unsatisfactory performance was a factor in USEC's decision to terminate her. For example, in conclusion, she states "[d]enied training by these male employees, Ms. Rudolph could not have succeeded in her training program." She also cites *White*, the Sixth Circuit case that sets forth the summary judgment analysis of Title VII mixed-motive claims, at the end of her sex discrimination argument.

Another unclear aspect of Rudolph's claim is whether she is asserting that USEC's adverse action against her occurred when it denied her training opportunities or when it terminated her. In her Response, Rudolph leads her argument with the heading "Defendant discriminated against Ms. Rudolph on the basis of her sex and age in denying her training opportunities available to male trainees." Then, when discussing her prima facie case of discrimination, she only addresses the adverse employment decision in a single conclusory sentence: "Ms. Rudolph has indisputably satisfied the first two elements of her sex discrimination claim," referring to whether she is a member of a protected group and whether she was subjected to an adverse employment decision. To support this statement, Rudolph cites a decision with the explanatory parenthetical "noting . . . terminating employee is adverse employment action."

Having reviewed the record, the Court understands Rudolph to be asserting a single-motive discriminatory training claim. Rudolph claims she was denied training opportunities because of her sex. Though she refers to her termination as the adverse employment action in an

14

explanatory parenthetical, she never once contends or presents any facts that she was terminated because she is a woman. Conversely, she repeatedly asserts that she was denied training opportunities because she is a woman.

### 2. *Rudolph's Discriminatory Training Claim Based on Coworker Sex Discrimination*

Title VII provides that "[i]t shall be an unlawful employment practice for any employer . . . controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of . . . sex . . . in admission to, or employment in, any program established to provide apprenticeship or other training." 42 U.S.C. § 2000e-2(d). Rudolph contends that USEC "denied her training opportunities available to its male and younger trainees." She states that she "could not get help from most of the male Operators on her crew and was limited to sporadic assistance from a single male Operator and working with a relatively new female Operator."

When coworkers "engage in discrimination, employers are not automatically liable; only if they know (or ought to know) what is going on and choose to do nothing (or select ineffectual steps when better ones are available) are they liable." *Maalik v. Int'l Union of Elevator Constructors*, 437 F.3d 650, 653 (7th Cir. 2006) (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 759 (1998) and *Faragher v. Boca Raton*, 524 U.S. 775 (1998)); *see also Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 347 (6th Cir. 2008) (explaining that an employer will be liable for coworker's retaliatory conduct only if supervisors or members of management have actual or constructive knowledge of the behavior and have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances). For example, in

*Maalik v. International Union of Elevator Constructors*, the plaintiff had joined a local union of elevator workers and was assigned to work as a "helper." 437 F.3d at 651. Senior workers trained the helpers. *Id.* The district court found that the senior workers had refused to provide on-the-job training to the plaintiff because she is a black woman. *Id.* The plaintiff had protested to the union about the discrimination, but the union did nothing to help her and also refused to give her a permit, which would have resulted in higher wages, because she had not received the on-the-job training. *Id.* The Seventh Circuit held that the union was liable under Title VII for doing nothing in response to senior workers' refusal to train the plaintiff. *Id.* at 654. The court explained that if the union had done everything reasonable under the circumstances then it could not be held liable, but because it chose to do nothing it was liable. *Id.* at 653-54.

Here, even if Rudolph could prove that the male Operators resisted training her because of her sex, USEC cannot be held liable under Title VII because there is no evidence that any supervisor or manager had any actual or constructive knowledge of the situation. Rudolph does not contradict USEC's assertion that she never complained to Dockery about any alleged problems that she had with the male Operators. She does not present any other evidence that any supervisor or manager knew or should have known that the male Operators were allegedly denying her training opportunities. Therefore, USEC is entitled to summary judgment on Rudolph's claim of sex discrimination pursuant to Title VII and the Kentucky Civil Rights Act.

Additionally, even if Rudolph meant to assert a mixed-motive claim– that she was terminated because she performed unsatisfactorily, but sex was a motivating factor in her termination because her unsatisfactory performance was a result of the discriminatory denial of training opportunities– USEC cannot be held liable. Here too, any alleged sex discriminatory

conduct by Rudolph's coworkers cannot be imputed to USEC's act in terminating her because there is no evidence that USEC had any knowledge of the alleged sex discrimination. Rudolph has also not presented any evidence of an anti-woman animus by any of the individuals involved in terminating Rudolph.

C.      *Rudolph's Claim of Age Discrimination*

The ADEA provides that it "shall be unlawful for any employer– (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Rudolph claims that she was discriminated against because of her age.

Rudolph's response to USEC's argument that it is entitled to summary judgment on her claim of age discrimination is limited to two footnotes. These footnotes do not articulate a viable theory of discrimination. Again, it is unclear whether Rudolph regards the adverse employment action at issue to have occurred when she was allegedly denied training opportunities or when she was terminated. Either way, she fails to present a case of age discrimination. If the adverse employment action occurred when she was allegedly denied training opportunities, then she has failed to present any evidence that a supervisor or manager was aware of the situation. *See supra* Part B.2. If the adverse employment action occurred when she was terminated, she has failed to present any evidence either that she was replaced by a younger employee or that similarly situated non-protected employees were treated more favorably. *See Tuttle v. Metropo. Gov't of Nashville*, 474 F.3d 307, 317-18 (6th Cir. 2007). The only other trainee in her class who failed a test was Phyllis Pharis-Baete, who was 60 years old.

Pharis-Baete was remediated and passed the test the following day. Rudolph offhandedly references a younger female who was allowed to skip part of her training without penalty, but there is no evidence to show that this woman was similarly situated to Rudolph. In her deposition, Rudolph states that this employee, Jessica Lee, told her that she did not climb the crane because she is afraid of heights, but Lee was not part of Rudolph's trainee group and Rudolph has not provided the Court with any other evidence regarding Lee, including her age. Rudolph Dep. 67:7, Aug. 15, 2008. Therefore, USEC is entitled to summary judgment on Rudolph's claim of age discrimination pursuant to the ADEA and the Kentucky Civil Rights Act.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (DN 17) is GRANTED.

An appropriate order shall issue.